UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
CASEY FISHER,                   )
          Petitioner            )
                                )
v.                              )       CIVIL ACTION
                                )       NO. 08-11186-RCL
UNITED STATES OF AMERICA,       )
          Respondent            )
```

MEMORANDUM AND ORDER

Young, D.J.                                    July 30, 2009

## I.    INTRODUCTION

Casey Fisher ("Fisher") petitions this Court to vacate his sentence and grant a new trial pursuant to 28 U.S.C. § 2255. (Pet'r Br., Doc. No. 117.[1])  Fisher is currently serving a 168-month sentence imposed by this Court after he pled guilty to one count of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846 and was found guilty by a jury of one count of the use of interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958(a), and one count of solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373.

Fisher asserts two related claims of ineffective assistance of counsel.  First, he claims that the advice he received from

---

[1]  All docket numbers refer to the criminal  docket in United States v. Fisher, 03-10244-RCL, the case under which Fisher was convicted of the three separate criminal counts.  The Court ordered that all filings in Fisher's section 2255 petition be filed on the 03-10244-RCL docket, as opposed to the 08-11186-RCL docket.

his attorney not to testify at trial was based on his attorney's objectively unreasonable and overly optimistic reading of the case law regarding the murder-for-hire statute.  Had his attorney provided effective advice, he contends that he would have chosen to testify and that his testimony would have altered the result of the trial.  Second, Fisher claims that but for that same erroneous advice about the murder-for-hire statute, he would have pled guilty, as opposed to proceeding to trial, and would potentially have received a lesser sentence.  The United States has moved to dismiss the petition without a hearing, arguing that Fisher's claims are procedurally barred and, in the alternative, are completely unwarranted in law and fact.

## II.  FACTS AND PROCEDURAL HISTORY

### A.  Brousseau's Controlled Delivery of the Marijuana Shipment

On April 24, 2002, Alain Brousseau ("Brousseau"), a Canadian truck driver, was apprehended at a United States checkpoint in Champlain, New York.  United States v. Fisher, 494 F.3d 5, 6 (1st Cir. 2007).  Brousseau attempted to cross the U.S. border from Canada with 166 kilograms of hydroponic marijuana, hidden in seven large duffel bags in the rear of his tractor trailer.  Id. After his apprehension, Brousseau agreed to cooperate with law enforcement authorities by allowing them to monitor a controlled delivery of the marijuana to Route 79 Auto Sales ("Route 79" or "the garage") that same evening.  Id. at 7; Day 2 Trial Tr. 34,

2

57, Doc. No. 89.  Route 79 was an auto garage located in Lakeville, Massachusetts, and operated by Fisher.  (Trial Day 2 Tr. 34.)  Route 79 also served as a marijuana storehouse for George Otero ("Otero"), a close associate of Fisher and a major player in marijuana trafficking in the state of New Hampshire.[2] (Id. at 35-36, 84.)

When Brousseau arrived at the garage, Fisher and his brother, John Fisher ("John"), helped Brousseau unload the marijuana from the tractor into the garage.  Fisher, 494 F.3d at 7.  As Brousseau pulled his tractor away from the garage, authorities stopped the tractor and moved in to arrest Brousseau, John, and Fisher.  Id.; Day 2 Trial Tr. 62.  Brousseau was arrested by authorities; however, Fisher and John managed to escape away into the woods.  Fisher, 494 F.3d at 7; Day 2 Trial Tr. 63.

**B.   Fisher's Attempts to Hire Someone to Murder Brousseau**

In October 2002, John was arrested and charged in the United States District Court for the Northern District of New York with conspiracy to possess marijuana with intent to distribute. Fisher, 494 F.3d at 7.  On July 23, 2003, Fisher was indicted and charged, in a sealed indictment filed in this district, with one count of conspiracy to possess with intent to distribute

---

[2]  Otero also served as a cooperating witness in the case against Fisher.  (Day 2 Trial Tr. 84.)

marijuana, pursuant to 21 U.S.C. § 846.  (Indictment, Doc. No.
1.)  He was not, however, apprehended at the time.

On August 28, 2003, Fisher arranged a meeting with Otero at
which the two discussed the case pending against John.  Fisher,
494 F.3d at 7.  Otero agreed to tape record the conversation, as
part of his ongoing cooperation with the authorities in relation
to his involvement with the drug bust at Route 79.  During the
conversation, Fisher explained to Otero his belief that
Brousseau's testimony was the only piece of evidence the
government had against his brother.  Id.  Additionally, Fisher
informed Otero that he wanted to "get rid" of Brousseau so there
would be no evidence against John.  Id.  Fisher also stated that
he was going to ask "Ray-Ray," otherwise known as Raymond Aucoin
("Aucoin" or "Ray Ray")[3] to murder Brousseau.

Sometime before August 31, 2003, Fisher arranged by phone to
meet with Aucoin in person.  At that meeting, he asked Aucoin to
murder Brousseau.  Id.  Fisher, however did not yet know
Brousseau's identity or name; consequently, sometime between the
date he met first met with Aucoin and August 31, 2003, Fisher
made phone calls to a man named Norman Ouimette, who lived in
Canada, to ask if he knew the identity of the truck driver.  Id.

---

[3]  Aucoin was a close associate of Fisher with "an extensive
criminal history," who engaged in illegal narcotics activities in
the past and had participated in breaking and entering homes with
Fisher.  (Day 2 Trial Tr. 85.)

Ouimette ultimately provided Fisher with Brousseau's name.
Fisher then met with Aucoin on August 31 and gave Aucoin a small
piece of lined paper with Brousseau's name handwritten on it.
(Day 2 Trial Tr. 98.)

Pursuant to the information gained from the earlier recorded
conversation between Fisher and Otero, investigators ordered
surveillance of Aucoin.  On September 5, 2003, Aucoin flagged
down the local police officer who was conducting surveillance and
agreed to become a cooperating witness in the case against
Fisher.  Id.  It was during this meeting that Aucoin informed
authorities that Fisher had asked him to murder Brousseau.  Id.

On September 8, 2003, Aucoin met with Special Agent Walter
Houghton ("Houghton") for the first time.  Agent Houghton, a
customs and immigration agent, served as the case agent for the
case against Fisher.  (Day 2 Trial Tr. 55; Day 5 Trial Tr. 93,
Doc. No. 92.)  Aucoin informed Agent Houghton that Fisher had
asked him to murder Brousseau.  He also provided Agent Houghton
with the piece of paper upon which Fisher had written Brousseau's
name.  Fisher, 494 F.3d at 7.

On September 10, 2003, at the direction of law enforcement,
Aucoin met with Fisher and informed him that he would not murder
Brousseau.  Id. at 7.  In order to arrange this meeting, Fisher
called Aucoin at least once.  At the meeting, Aucoin also told
Fisher that he had found another hit man, Sgt. Michael Grassia

("Grassia") serving in an undercover capacity, who would kill
Brousseau.  Fisher and Aucoin discussed the price that Grassia
would charge and whether it would be necessary to provide Grassia
with any of the money before Brousseau's murder was confirmed.
The two also discussed how Grassia would be able to access
Brousseau in prison in Canada.

On September 19, 2003, after a series of phone calls between
Aucoin and Fisher, at least one of which was initiated by Fisher,
Aucoin, Fisher, and Grassia, met at the Lion's Club in Lakeville,
Massachusetts.  Id.  During this meeting, Grassia and Fisher
discussed the "hit" on Brousseau and Grassia demanded an initial
$5,000 payment from Fisher, as a sign of good faith, with the
other $5,000 due upon completion of the job.  Id.  Fisher assured
Grassia that he would be able to get the money and that the money
would be available the following Friday.  Id.  On September 23,
2003, before Fisher engaged in any conduct consistent with
accepting Grassia's offer, authorities arrested Fisher on a
warrant for the indictment issued on July 23, 2003.  Id.

    **C.  Fisher's Trial**

On October 29, 2003, a superseding indictment was issued
against Fisher, charging him with conspiracy to possess marijuana
with intent to distribute marijuana, in violation of 21 U.S.C. §
846; use of interstate commerce facilities in the commission of
murder-for-hire, in violation of 18 U.S.C. § 1958(a); and

solicitation to commit a crime of violence, in violation of 18 U.S.C. § 373. (Superseding Indictment, Doc. No. 14.) On June 6, 2005, Fisher pled guilty to count one of the superseding indictment, conspiracy to possess with intent to distribute at least 100 kilograms of marijuana. Fisher, 494 F.3d at 8 n.1.

On November 29, 2004, a six-day jury trial began on the two remaining counts. During trial, the government produced witnesses[4] who testified to previous drug transactions in which Fisher was involved, the controlled marijuana delivery made by Brousseau, Fisher's previous crimes, and the conversations and meetings between Fisher, Otero, Aucoin, and Grassia. (See generally Day 2 - Day 5 Trial Trs.) Through witness testimony and tapes introduced at trial, the government sought to demonstrate that Fisher wanted Brousseau dead, made calls in furtherance of that goal, and knew it would come at a price of $10,000. (Day 5 Trial Tr. 37.)

Fisher's defense strategy, arrived at after consultation with his attorney, had at least two components. First, Fisher's attorney attempted to undermine testimony supporting an inference that Fisher ever had the necessary intent, while using a facility in interstate commerce, to commit the murder of Brousseau.

---

[4] Government witnesses included Special Agent Charles Callioras ("Callioras"), a special agent with Immigration and Customs Enforcement (ICE); Agent Houghton; Grassia; Aucoin; Brousseau; and Otero. (Day 2 Trial Tr. 55; Day 5 Trial Tr. 93.)

Defense counsel sought to demonstrate that since Fisher never acted upon his agreement to produce $5,000 in order for Grassia to complete the job, he committed no crime. (Id.) Through the testing of witnesses' credibility, particularly Aucoin's, defense counsel sought to undermine juror confidence in their testimony and weaken the government's case against his client. (Id. at 60.) Defense counsel actively cross-examined witnesses and tested their credibility on the stand. (See generally Day 2 - Day 5 Trial Trs.) In closing arguments, Fisher's counsel spent the majority of his time forcefully arguing that Fisher never possessed the requisite intent to be convicted under 18 U.S.C. § 1958.

Second, and more important for the purpose of the instant petition, Fisher's attorney pursued what Fisher has labeled, in his moving papers and his affidavit, as his "question of law" defense. More accurately defined as a "jurisdictional" defense, the substance of the theory, as recited by the First Circuit, was as follows:

> At the time of Fisher's indictment and conviction, 18 U.S.C. § 1958(a) defined as an element of the crime use of a facility in interstate or foreign commerce, while § 1958(b) defined a facility of interstate or foreign commerce as including means of communication. 18 U.S.C. § 1958 (2000). Fisher argue[d] that the use of the word "in" in § 1958(a) is significant. He urge[d] that while the language "use of a facility of interstate commerce" encompasses intrastate usage of a telephone, the use of a facility in interstate commerce requires interstate or cross-border usage. Fisher thus argue[d]

that the government was required to prove interstate or
cross-border usage, and that it failed to do so.

<u>Fisher</u>, 494 F.3d at 10.

According to an affidavit submitted by Fisher's attorney,
he was confident that this jurisdictional defense "would result
in [Fisher's] acquittal of the charges after trial." (Cintolo
Aff. ¶ 7, attach. to Pet'r Br.)  Because of defense counsel's
belief in the strength of this legal argument, "on several
occasions," defense counsel "informed [Fisher] that he was
innocent of the [murder-for-hire] count [in] his indictment, to
wit 18 U.S.C. 1958, in that an element of the offense was lacking
. . . ." (<u>Id.</u> ¶ 6; <u>see also</u> Fisher Aff. ¶¶ 5-7, attach. to Pet'r
Br. ("On several occasions, [my attorney] informed and assured me
that I could not be convicted of the crimes alleged in my
indictment, 'as question of law.' [¶]  He said that . . . the
government could not establish an essential element of the
charge. [¶]  That as a result I could not be convicted of the
charges.").)

As a crucial part of the strategy to feature this
jurisdictional defense, Fisher's attorney "insisted to [Fisher] .
. . that if he testified on his own behalf this would severely
prejudice [the jurisdictional] defense by making credibility an
issue." (Cintolo Aff. ¶ 8.)  Accordingly, even though Fisher
repeatedly expressed, both before and during trial, his desire to
testify in order to explain that he never intended to commit a

murder-for-hire (<u>id.</u> ¶¶ 5-6; Fisher Aff. 4), defense counsel

"strongly advised [Fisher] to waive his right to testify."

(Cintolo Aff. ¶ 9.)   Ultimately, persuaded by his attorney,

Fisher decided not to testify in his own defense.

At the close of the government's case, Fisher's attorney

submitted a Rule 29 motion for judgment of acquittal.   Fisher's

attorney renewed that motion after he rested his case, and

requested that he be able to submit it in writing at a later

date.   The Court granted that request.   (Day 5 Trial Tr. 34-35.)

A discussion of the briefing of the motion is provided below.

After both parties finished closing arguments, the jury

received instructions from the Court.   (Day 5 Trial Tr. 81-108.)

The Court instructed the jury, without any objection from

Fisher's counsel, "that intrastate use of a telephone or cellular

phone was all that" 18 U.S.C. § 1958 required.   <u>Fisher</u>, 494 F.3d

at 10.   On December 6, 2004, the jury returned a verdict of

guilty on both counts.   <u>Fisher</u>, 494 F.3d at 8.

### D.   **Fisher's Rule 29 Motion**

On March 3, 2005, Fisher's attorney submitted a memorandum

in support of Fisher's Rule 29 motion for acquittal, arguing,

<u>inter alia</u>, that the government failed to "to produce sufficient

evidence at trial to establish the jurisdictional element of 18

U.S.C. § 1958(a) - that the defendant used a facility 'in

interstate commerce.' "   (Rule 29 Mot. 7, Doc. No. 85.)   In

support of his argument that intrastate phone calls were an insufficient basis for a conviction, Fisher's attorney relied almost exclusively on the language and reasoning from an Eleventh Circuit case, <u>United States</u> v. <u>Drury</u>, 344 F.3d 1089 (11th Cir. 2003). (<u>See</u> Rule 29 Mot. 7-14.)  Defense counsel failed, however, to acknowledge, let alone discuss, that <u>Drury</u> had been vacated pending rehearing <u>en banc</u> on February 3, 2004, prior to Fisher's trial, 358 F.3d 1280 (11th Cir.), and had been superseded by an <u>en banc</u> opinion on January 18, 2005, prior to the submission of the memorandum in support of the Rule 29 motion, 396 F.3d 1303 (11th Cir.).  On April 12, 2005, this Court denied Fisher's Rule 29 motion.

### E.   Fisher's Appeal

In May 2007, Fisher appealed his conviction to the United States Court of Appeals for the First Circuit.  (Pet'r Br. 2.) Fisher, represented by counsel, appealed his conviction and sentence on the grounds that (1) "the government failed to show that the planned murder was in violation of a state or federal law, as required by the federal murder-for-hire statute,[5] . . . [2] the government failed to meet its burden on the murder-for-hire charge, . . . [3] trial errors require . . . remand for a new trial, and . . . [4] errors at sentencing require" vacation

---

[5]   Fisher was assisted by counsel only on this ground. <u>Fisher</u>, 494 F.3d at 6.

of his sentence.  <u>Fisher</u>, 494 F.3d at 6.  On July 13, 2007, the
First Circuit rejected all of the Fisher's claims and affirmed
his conviction and sentence.  <u>Id.</u>

Of particular relevance to the instant petition, the First
Circuit addressed Fisher's jurisdictional argument.  The court
viewed this ground of appeal as a claim of "instructional error
because it is premised on a reading of the murder-for-hire
statute that differs from the instruction given to the jury."
<u>Id.</u> at 10.  Because Fisher's counsel did not object to the jury
instruction, the court examined the jury instruction for plain
error.  <u>Id.</u>  The court admitted explicitly that it was an open
question in the First Circuit as to "whether the version of §
1958(a) in effect at the time of Fisher's conviction requires the
government to show interstate or cross-border activity, or
whether intrastate usage of a means of communication such as a
telephone will suffice."  <u>Id.</u> at 10.  The court did not, however,
reach the issue.  Instead, it held that even if the jury
instruction was incorrect, i.e., 18 U.S.C. § 1958 did not
criminalize intrastate communications, the error was harmless.
<u>Id.</u> 10-11.  Specifically, the court explained that the evidence
"strongly supported the reasonable inference that Ouimette lived
in Canada and was in Canada when he spoke to Fisher, and that
Fisher therefore made cross-border calls to contact him."  <u>Id.</u> at
11.  The court held that the evidence introduced at trial, viewed

12

in the light most favorable to the prosecution, "was more than sufficient" to support a reasonable inference that Fisher had made a cross-border phone call with an intent to further a murder-for-hire.  Id.

### F.  Fisher's Section 2255 Petition

Fisher filed the instant petition on July 10, 2008. (Doc. No. 116 & 117.)  After receiving two extensions of time, the government filed its opposition on November 10, 2008.  (Doc. No. 123.)  Fisher filed his reply on November 28, 2008.  (Doc. No. 124.)

## III.  ANALYSIS

### A.   Standard of Review

Under section 2255, this Court is authorized to discharge or resentence a defendant if it concludes that the sentence "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."[6]  28 U.S.C. § 2255  Under section 2255, the court shall

---

[6]  Section 2255(a) provides in full that:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is

13

grant an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[7]   <u>Mack</u> v. <u>United States</u>, 635 F.2d 20, 26 (1st Cir. 1980) (quoting 28 U.S.C. § 2255).  A petitioner bears the burden of demonstrating by a preponderance of the evidence that he is entitled to relief, including demonstrating entitlement to an evidentiary hearing.  <u>United States</u> v. <u>DiCarlo</u>, 575 F.2d 952, 954 (1st Cir. 1978).  Generally, a hearing is not required when a section 2255 petition "(1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and

---

otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. §2255(a).

[7]   Section 2255(b) provides in full that:

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the     judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him as may appear appropriate.

28 U.S.C. §2255(b).

14

records of the case."  <u>Moran</u> v. <u>Hogan</u>, 494 F.2d 1220, 1222 (1st
Cir. 1974).

A petitioner's allegations are accepted "as true except to
the extent they are contradicted by the record, inherently
incredible, or conclusions rather than statements of fact."
<u>Pocaro</u> v. <u>United States</u>, 784 F.2d 38, 40 (1st Cir. 1986).
Additionally, "[i]f it plainly appears from the motion, any
attached exhibits, and the record of prior proceedings that the
moving party is not entitled to relief, the judge must dismiss
the motion."  Rule 4(b), Rules Governing Section 2255
Proceedings.

### B.   Ineffective Assistance of Counsel

Fisher's petition contends that he received ineffective
assistance of counsel during the pre-trial and trial stages of
his prosecution.  The Sixth Amendment of the United States
Constitution guarantees "in all criminal prosecutions, the
accused shall enjoy the right . . . to have the Assistance of
Counsel for his defence."  U.S. Const. amend. VI.  It has been
determined that the right to assistance of counsel is the right
"to be assisted by an attorney . . . who plays the role
necessary to ensure that the trial is fair."  <u>Strickland</u> v.
<u>Washington</u>, 466 U.S. 668, 685 (1984).  "The Sixth Amendment
recognizes the right to the assistance of counsel because it
envisions counsel's playing a role that is critical to the

15

ability of the adversarial system to produce just results." Id.
Thus, "[t]he right to counsel is the right to the effective
assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771
n.14 (1970).

To assert a claim of ineffective assistance of counsel,
the petitioner must demonstrate that his attorney: (1) rendered
performance that fell below an objective standard of
reasonableness, and (2) that as a result of his attorney's
unreasonable performance, he suffered actual prejudice.
Strickland, 466 U.S. at 687.  An attorney's performance is
judged by a standard of "reasonableness under prevailing
professional norms." Id. at 688.  Generally, "[c]ounsel is
strongly presumed to have rendered adequate assistance and made
all significant decisions in the exercise of reasonable
professional judgment." Id. at 690.  Put somewhat differently,
"the defendant must overcome the presumption that, under the
circumstances, the challenged action might 'might be considered
sound trial strategy.' " Id. at 689 (quoting Michel v.
Louisiana, 350 U.S. 91, 101 (1955)).  Considering the totality
of the circumstances, an attorney's conduct must be evaluated
from his perspective at the time. Id.  The court's review of
counsel's performance must also be "highly deferential." Id.

A petitioner must also demonstrate that he has suffered
actual prejudice as a result of his attorney's deficient

16

performance, by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." Dugas v. Coplan, 428 F.3d 317, 327 (1st Cir. 2005) (quoting Strickland, 466 U.S. at  698) (internal quotation marks omitted). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." United States v. De La Cruz, 514 F.3d 121, 140 (1st Cir. 2008) (quoting Strickland, 466 U.S. at 697) (internal quotation marks omitted). Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

### 1. Fisher's Ineffective Assistance of Counsel Claims Are Not Procedurally Barred.

The government asserts that Fisher's petition should be dismissed because the issues it raises have been or could have been brought on direct appeal. It has long been held that a "collateral challenge may not do service for an appeal." United

17

States v. Frady, 456 U.S. 152, 165 (1982).  An equally entrenched doctrine holds, however, that "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under section 2255, whether or not the petitioner could have raised the claim on direct appeal."  Massaro v. United States, 538 U.S. 500, 504 (2003).  Thus, contrary to the government's argument, Fisher's ineffective assistance of counsel claims are not procedurally defaulted.  Further, the crucial factual allegations in Fisher's petition relate to the advice he received from his counsel about the strength of his jurisdictional defense.  Because such privileged conversations are not held on the record, and thus could not be examined by the First Circuit on direct appeal, a section 2255 petition, in which a court can consider off-the-record allegation, presents the proper mechanism for raising such claims.

> **2.  Fisher Did Not Receive Ineffective Assistance of Counsel.**

Fisher puts forward two claims of ineffective assistance of counsel that both emanate from the advice he received from his attorney regarding the strength of his jurisdictional defense.  First, he asserts that his attorney, relying on objectively unreasonable legal research about the jurisdictional scope of 18 U.S.C. § 1958, provided ineffective assistance of counsel by strongly advising Fisher to waive his fundamental constitutional right to testify at trial.  Second, Fisher

18

contends that his attorney's inaccurate advice about the strength of the jurisdictional defense caused Fisher to plead not guilty, proceed to trial, and forego a possible reduction in sentence for sparing the government the burden and expense of trial.

### a.   The Right to Testify

"It is clear that a defendant has a 'fundamental constitutional' right to testify in his own defense, and that the right must be 'unfettered.'" Owens v. United States, 483 F.3d 48, 58 (1st Cir. 2007) (quoting Rock v. Arkansas, 483 U.S. 44, 51-53 (1987), and Harris v. New York, 401 U.S. 222, 230 (1971)). Because "[a] lawyer plays the primary role in advising his client of the right to testify," id., "an ineffective assistance of counsel claim is the appropriate vehicle for a criminal defendant to raise an alleged violation of his right to testify." United States v. Van De Walker, 141 F.3d 1451, 1452 (11th Cir. 1998). To prevail on such a claim, a defendant must satisfy Strickland's familiar performance and prejudice analysis. See Owens, 483 U.S. at 57-58.

"Unaccompanied by coercion, legal advice concerning exercise of the right to testify infringes no right, but simply discharges defense counsel's ethical responsibility to the accused." Lema v. United States, 987 F.2d 48, 52 (1st Cir. 1993) (citation omitted). In the context of the right to testify, the

First Circuit has interpreted the term "coercion" as having at least three potential meanings.  First, defendants may be coerced into unknowingly and involuntarily waiving their right to testify if their attorney entirely fails to inform their client that they have a right to testify.  See id. (holding that one consideration regarding whether a defendant has been coerced is "[w]hether the defendant knew about his constitutional right to testify, and if not, whether he was informed by counsel").  Second, defendants may be deprived of their fundamental right to testify if "the [in]competence and [un]soundness of defense counsel's tactical advice" regarding whether they should testify, leaves defendants "with[out] sufficient information to permit a 'meaningful' voluntary waiver of the right to testify."  Id. at 53.  Finally, coercion may occur where "intimidation or threatened retaliation by counsel relating to the defendant's testimonial decision" causes a defendant not to testify.  Id.

Fisher's petition fits squarely into the second category. He alleges that his attorney strongly advised him not to testify because of concerns that putting Fisher on the stand would distract from, if not undermine entirely, Fisher's jurisdictional defense.  Fisher claims, however, that when his attorney advised him not to testify, his attorney held a fundamentally erroneous understanding of the state of the law regarding whether 18 U.S.C. § 1958 brought intrastate phone calls within its ambit.  Because

20

of this misunderstanding, Fisher contends that the advice he
received regarding whether to testify was inaccurate and overly
optimistic such that he could not intentionally and knowingly
waive his right to testify at trial.  Put differently, Fisher
claims that he chose not to testify because of his attorney's
optimism about Fisher's chances of beating the murder-for-hire
count by means of the jurisdictional defense; and that his
attorney's confidence in the defense was the product of
objectively unreasonable legal research.

Fisher asserts that his attorney's optimism about the
jurisdictional defense was incorrect in two respects.  First,
Fisher claims that at the time of his trial and conviction, it
was settled law within the First Circuit that evidence of
intrastate phone calls made in furtherance of an murder-for-hire
were sufficient for a conviction under 18 U.S.C. § 1958.  Second,
he claims that his attorney's confidence that intrastate phone
calls could not satisfy the jurisdictional element of 18 U.S.C. §
1958 was founded primarily, if not exclusively, on an Eleventh
Circuit case that had been vacated and overturned by the time of
Fisher's trial and conviction.  He contends that individually or
collectively, these shortcomings demonstrate that his attorney's
performance fell below an objective standard of reasonableness.

Fisher's first allegation of ineffectiveness can be easily
dismissed.  The opinion in Fisher's own appeal clearly indicates

21

that at the time of his trial and conviction, it was an open question within the First Circuit as to whether evidence of intrastate phone calls was sufficient to obtain a conviction under 18 U.S.C. § 1958.  On appeal, Fisher asserted "that the evidence [was] not sufficient to sustain his conviction on the murder-for-hire count because the government failed to prove the jurisdictional element of 18 U.S.C. § 1958." <u>Fisher</u>, 494 F.3d at 9.  In addressing this claim, the First Circuit explicitly stated that "[a]s to the legal question, this circuit has not previously determined whether the version of § 1958(a) in effect at the time of Fisher's conviction requires the government to show interstate or cross-border activity, or whether intrastate usage of a means of communication such as a telephone will suffice." <u>Id.</u> at 10. Given this proclamation, Fisher's attorney was clearly correct that in the First Circuit at the time of Fisher's trial and conviction, the jurisdictional scope of 18 U.S.C. § 1958 was not a settled issue.  Thus, Fisher's attorney's performance was not deficient, at least to the extent Fisher alleges his attorney held an unreasonable view of relevant First Circuit case law.

That Fisher's attorney's jurisdictional defense was viable in the First Circuit does not, however, necessarily make his attorney's performance reasonable.  According to Fisher's and his attorney's affidavits, Fisher's attorney conveyed to Fisher that the jurisdictional defense was remarkably strong, almost

unassailable.  Fisher's attorney told Fisher that "he was
innocent of the" murder-for-hire count, that "an element of the
offense was lacking, and that he "was confident that [the
jurisdictional] defense would result in [Fisher's] acquittal of
the charges after trial." (Cintolo Aff. ¶¶ 6-7.)  Fisher
understood these statements to mean that he "could not be
convicted of the crimes alleged in [his] indictment." (Fisher
Aff. ¶ 5; see also id. ¶¶ 6-7 ("[My attorney said that 'as a
question of law' the government could not establish an essential
element of the charge.  [¶]  That as a result I could not be
convicted of the charges.").)  Fisher's attorney also conveyed to
Fisher that "if [Fisher] testified on his own behalf this would
severely prejudice" the jurisdictional defense.  (Cintolo Aff. ¶
8 (emphasis added).)  Fisher interpreted his attorney's caution
to mean that "if [he] insisted on testifying, his [jurisdictional
defense] would be badly prejudiced, because [he] would put [his]
credibility at issue . . . ." (Fisher Aff. ¶ 8.)  Further,
Fisher believed that "if [he] testified, [he] would be convicted
of the . . ." murder for hire charge.  (Id. ¶ 9.)

     As it turns out, Fisher's attorney's basis for believing
that the jurisdictional defense had a high likelihood of success
(and thus his reason for advising Fisher not to testify), was
grounded on a dubious reading of the out-of-circuit case law.  In
support of Fisher's Rule 29 motion, in which he argued that

23

intrastate phone calls were an insufficient basis for a
conviction, Fisher's attorney relied almost exclusively on the
language and reasoning of an Eleventh Circuit opinion, United
States v. Drury, 344 F.3d 1089 (11th Cir. 2003).  (See Rule 29
Mot. 7-14.)  In that case, an Eleventh Circuit panel concluded
that "18 U.S.C. § 1958(a)'s jurisdictional element requires that
a defendant must actually use a facility in a manner that
implicates interstate commerce, not just that the facility itself
possess the capability of affecting interstate commerce."  Id. at
1104.  Fisher's attorney states that his "legal authority for
[the jurisdiction defense] was the case of U.S. v. Drury0. . . ."
(Cintolo Aff. ¶ 11.)

    At the time of Fisher's trial and the submission of
Fisher's Rule 29 motion, however, Drury was no longer good law.
The Eleventh Circuit, sitting en banc, vacated the opinion
pending rehearing on February 3, 2004, prior to Fisher's trial,
358 F.3d 1280 (11th Cir.), and issued a superseding opinion on
January 18, 2005, prior to the submission of the memorandum in
support of the Rule 29 motion, 396 F.3d 1303 (11th Cir.).  In
that superseding opinion, the Eleventh Circuit, much like the
First Circuit in Fisher's own appeal, elected "not [to] decide
whether § 1958(a) actually requires that a facility be used in
interstate commerce, since it suffices here to observe that
uncontroverted evidence establishes that the relevant facility

24

(the telephone) <u>was</u> so used."  <u>Id.</u> at 1312.  Fisher's attorney
did not acknowledge anywhere in the Rule 29 motion that the exact
holding he relied upon in the <u>Drury</u> panel opinion had fallen in
disrepute.  Fisher's attorney also admits that "due to [his]
overload of work at the time, [he] cannot be certain whether [he]
Shepardized <u>U.S. v. Drury</u>."  (Cintolo Aff. ¶ 13.)

Fisher's attorney did cite at least two other cases --
<u>United States</u> v. <u>Weathers</u>, 169 F.3d 336, (6th Cir. 1999), and
<u>United States</u> v. <u>Paredes</u>, 950 F. Supp. 584, 590 (S.D.N.Y. 1996) -
- that, at the time, could be interpreted as supporting the
position that 18 U.S.C. § 1958 did not reach purely intrastate
phone calls.  But he also ignored some relevant First Circuit
authority that was indirectly hostile to his reading of the
statute and a slew of out-of-circuit cases holding that
intrastate phone calls could violate 18 U.S.C. § 1958.

Whether Fisher's attorney's legal research and the advice
that emanated from it fell below objective standards of
reasonableness is a difficult and close issue.  Although
attorneys receive great deference regarding strategic decisions,
this Court can conceive of no way to justify Fisher's attorney's
near-exclusive reliance on a superseded case, without even
acknowledging that the case had fallen into disrepute, as "sound
trial strategy."  Similarly, it is difficult to excuse Fisher's
attorney's failure to provide Fisher with a more nuanced analysis

of the jurisdictional defense's probability of success, particularly given the existing circuit split on the issue (with the weight of authority against Fisher's interpretation).

The Court need not decide the issue, however, because even if this Court assumes that Fisher's attorney's performance fell below an objective standard of reasonableness, Fisher cannot demonstrate that he suffered any prejudice.  To establish prejudice, Fisher must, but cannot, show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Fisher asserts that but for his attorney's misunderstanding of the jurisdictional element of 18 U.S.C. § 1958 and his resultant overstatement of Fisher's chances of securing an acquittal on the murder-for-hire charge, Fisher would have exercised his right to testify in his own defense.  Fisher's affidavit does not contain any talismanic statement to the effect of "if my attorney had provided me with a more realistic picture of the jurisdictional defense's probability of success, I would have testified at trial."  Still, Fisher's and his attorney's affidavits strongly support the inference that (1) Fisher repeatedly expressed a strong interest in testifying at trial (see Fisher Aff. ¶ 3 ("[O]n several occasions prior to my trial . . . , I informed Mr. Cintolo that I wished to testify in my own

defense at trial."); Cintolo Aff. ¶ 4 ("On several occasions [Fisher] insisted to me that he wanted to testify on his own defense.")), and (2) but for his attorney's advice that Fisher could only harm the jurisdictional defense by testifying, Fisher would have elected to testify.  (Cintolo Aff. ¶ 14 ("[I]n reliance on my assurances to him of my 'question of law' defense and the potential prejudice of his testimony to such defense, I convinced Casey Fisher to waive his right to testify and not proceed with a lack of intent defense.").)  This Court holds that, on its face, Fisher's petition demonstrates a reasonable probability that with more accurate information about the jurisdictional defense, he would have testified.

Demonstrating that he would have testified is only half the battle.  Fisher must also show that his hypothetical testimony would have so altered the trajectory of his trial such that this Court can no longer be confident in the trial's outcome.  Here, the lack of specificity in Fisher's affidavit regarding the proposed substance of his testimony, as well as the mountain of evidence submitted by the government, proves fatal to his claim. In his affidavit, Fisher states that he "would have challenged the government's evidence that [he] intended to commit the crimes alleged in [the] indictment."  (Fisher Aff. ¶ 4.)  His attorney explains that "[Fisher] told me that [through his testimony] he wanted to show the jury that he never had the intent of

27

committing the crimes, alleged, in his indictment." (Cintolo
Aff. ¶ 5.) In Fisher's memorandum to support his petition, he
provides a bit more detail about the potential substance of his
testimony. Fisher claims essentially that he would have
testified that he never contacted Grassia because he "never
intended to arrive at an agreement between himself and [Grassia]
nor to solicit him to do a murder for hire." (Pet'r Br. 12.)
Further, he would have explained that at worst, he intended to
tamper with Brousseau as a witness, and "convince" him not to
testify. (Id.)

The Court holds that none of Fisher's proposed testimony
undermines confidence in the outcome of his trial such that an
evidentiary hearing would be necessary. The government
introduced evidence, both circumstantial and direct, of at least
four phone calls that the fact-finder reasonably could have
determined were made with the intent that a murder-for-hire be
committed.

> -- A phone call or phone calls from Fisher to Norman
> Ouimette's home and cell phone in Canada made sometime
> between August 28 and August 31, 2003, to find out
> Brousseau's name. Otero and Aucoin testified that
> Fisher sought Brousseau's name so that he could
> identify the individual who would testify against his
> brother, John Fisher. The government also submitted
> into evidence a piece of paper with Brousseau's name
> that Fisher gave to Aucoin when Fisher requested that
> Aucoin murder Brousseau.

> -- A phone call or phone calls from Fisher to Aucoin to
> set up a meeting sometime between August 28 and August
> 31, 2003. Aucoin testified that at this meeting,

Fisher asked Aucoin to murder Brousseau.

-- A phone call or phone calls from Fisher to Aucoin to
set up another meeting on September 10, 2003, at which
the two could discuss whether Aucoin would murder
Brousseau.

-- A phone call or phone calls from Fisher to Aucoin
made on September 19, 2003, to set up the meeting with
Aucoin and Grassia, the undercover agent posing as a
hit man.  At the meeting, Fisher and Grassia discussed,
at length, that Fisher would have to pay Grassia $5,000
up front, and $5,000 after Brousseau was murdered.

None of Fisher's proposed testimony undermines the Court's

confidence that Fisher had the intent to murder Brousseau when he

made at least one of these telephone calls.  Given the

overwhelming evidence that all four calls were made with the

intent to further the murder of Brousseau, Fisher's testimony

that he did not intend to murder Brousseau would be inherently

incredible.  Over a period of at least three weeks from August

28, 2003, until September 19, 2003, Fisher made repeated

inquiries of multiple individuals, including Otero, Aucoin, and

Grassia, regarding how he could "get rid" of Brousseau.  He also

expressed on a number of occasions that he was willing to pay

someone to murder Brousseau.  Thus, even if this Court assumes

Fisher's attorney performed deficiently, Fisher suffered no

prejudice.[8]  Accordingly, this Court must deny Fisher's section

---

[8]  This analysis does not even take into account the
inherent risk involved if Fisher testified.  Once Fisher
exercised his right to testify, the government would have been
permitted to impeach Fisher's credibility.

2255 petition to the extent it asserts that the ineffective
assistance of his counsel resulted in the violation of his right
to testify.

> **b.    Ineffective Assistance Regarding Advice to
> Plead Not Guilty and Proceed to Trial**

Fisher also claims that but for his attorney's misinforming
him about the jurisdictional defense's chances of success, he
would have pled guilty to all charges and been eligible for a
three-level reduction in sentencing.  (Pet'r Br. 12-13.)  Here
again, Fisher has failed to demonstrate that he suffered any
prejudice.  Although he correctly states that he might have
received a lighter sentence had he pled guilty instead of
proceeding to trial, nowhere in his affidavit or his petition
does he state that, but for his attorney's deficient performance,
he would have pled guilty.  Without such a statement, this Court
cannot conclude that Fisher suffered any prejudice.  Thus, the
Court denies this component of Fisher's section 2255 petition.

**IV.    CONCLUSION**

For the reasons set forth above, the Court dismisses
Fisher's section 2255 petition.

SO ORDERED

/s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE